UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALTERG, INC.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>BOOST TREADMILLS LLC, et al.,<br><br>　　　　　　　Defendants. | Case No. 18-cv-07568-EMC<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION TO DISMISS**<br><br>Docket No. 15 |

Plaintiff AlterG, Inc. ("AlterG") brings this action against three of its former employees, Sean Whalen, Thomas Allen, and Michael James Bean (the "Individual Defendants") and the competing company they founded, Boost Treadmills LLC ("Boost") (collectively, "Defendants"). AlterG alleges that Defendants infringed its patents and misused its trade secret information to create Boost products. AlterG's complaint pleads ten causes of action: (1) patent infringement; (2) breach of contract; (3) trade secret misappropriation; (4) breach of fiduciary duty; (5) interference with contract; (6) interference with prospective economic advantage; (7) false advertisement; (8) trade libel; (9) unfair competition; and (10) conspiracy. Pending before the Court is Defendants' motion to dismiss all counts of the complaint. Docket No. 15 ("Mot.").

For the reasons stated on the record at the hearing on May 9, 2019 and discussed below, the motion to dismiss is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleges the following. Plaintiff AlterG is a "medical device company" that is the "leading provider of impact reduction treadmills," also known as "Anti-Gravity Treadmills," that are used for "orthopedic rehabilitation and training." Docket No. 1 ("Compl.") ¶ 14. "One of the keys [*sic*] drivers of AlterG's success is its patented Differential Air Pressure ('DAP')

United States District Court<br>Northern District of California

technology," which works by "us[ing] a pressurized bag to provide a counterforce to the subject's body weight, reducing their effective weight on the treadmill surface." *Id.* ¶ 15. From 2012 to 2015, AlterG devoted substantial resources to develop "a lower cost, bare bones AlterG machine" in response to "potential competitors who wanted to develop anti-gravity training and rehab machines using mechanical unweighting and other options, and at a lower price point than AlterG." *Id.* ¶ 22. AlterG calls this project the "Low-Cost Platform Project," or "LCPP." *Id.* AlterG ultimately decided not to commercialize or sell any products developed as part of the LCPP. *Id.* ¶ 23.

The Individual Defendants are three former employees of AlterG. "Whalen was the founder of AlterG" as well as "the initial and primary inventor . . . principally involved in developing the technology and products of the company." *Id.* ¶ 19. He therefore "had intimate access to and knowledge of AlterG products, technology, business plans, intellectual property strategy, marketing strategy, financial data, vendors, suppliers, customers, and confidential research and development." *Id.* In 2012, Whalen relinquished his former positions at AlterG but continued working for the company as a consultant until he stopped working for AlterG altogether on March 31, 2015. *Id.* ¶¶ 21, 24. During this consultancy period, "Whalen was the principal consultant and engineer" on the LCPP. *Id.* ¶ 22.

Allen joined AlterG in 2007 and has "held numerous jobs at AlterG in sales, business development, and in international sales." *Id.* ¶ 25. Through those positions, he became "intimately familiar with the products of AlterG and specifically the costing, bill of materials (BOM), sales and financial information, customer acquisition, marketing projections, and business strategy for AlterG products." *Id.* Like Whalen, Allen worked closely with the LCPP team from 2012 through 2015. *Id.* ¶ 27. Allen was also AlterG's "principal liaison" to Woodway USA ("Woodway"), a longtime supplier of treadmills for AlterG. *Id.* ¶¶ 25, 28. He resigned from AlterG on April 28, 2015. *Id.* ¶ 29.

Bean joined AlterG in 2008 and worked in various sales roles at the company. *Id.* ¶ 34. He resigned from AlterG in April 2017. *Id.* ¶ 35. "Since Bean's departure from AlterG in April 2017, AlterG has discovered communications between Bean and Allen about Allen's work

on a competing anti-gravity unit while Bean was still an employee of AlterG." *Id.*

Each of the Individual Defendants signed various confidentiality and non-disclosure agreements with AlterG during their employment with the company, which provided that they would "not use or disclose AlterG's proprietary and confidential information in any way contrary to the benefit of AlterG." *Id.* ¶¶ 20, 25, 34. AlterG and Woodway also "entered into various confidentiality agreements whereby AlterG would provide to Woodway proprietary and confidential information to assist Woodway to build and supply AlterG with anti-gravity units." *Id.* ¶ 31.

Boost was formed at the end of 2016 and registered in April 2017. *Id.* ¶ 36. Allen and Bean are founders of Boost, and Whalen worked for the company in product development. *Id.* AlterG believes that "Defendants conspired almost immediately [upon leaving AlterG] to create a competing machine incorporating AlterG intellectual property," and that "Boost was developing an unweighting treadmill well prior to the company's registration." *Id.* ¶¶ 36, 39. As part of this process, Whalen and Allen started "secretly" working with Woodway and "utilized confidential, proprietary, and trade secret information from the [LCPP], and other AlterG intellectual property, to shortcut the research and development time to come to market with a lower cost unweighting treadmill." *Id.* ¶ 33. "At the end of 2017, Boost introduced its first product—the Boost One," which "infringes AlterG patents" and "incorporates numerous technology features developed by AlterG in connection with the [LCPP]." *Id.* ¶ 38.

AlterG further alleges that Defendants "falsely claim that the problematic Boost One is a superior product over the AlterG DAP systems 'at a fraction of the cost.'" *Id.* ¶ 44. Defendants have also "told customers and prospects false statements to denigrate AlterG and its superior technology, falsely claiming that AlterG was going out of business, is in poor financial health and will not be able to get Woodway treadmills anymore." *Id.* ¶ 45. The upshot of Defendants' allegedly unlawful practices is that Defendants have been able to "sell over 20 units [of Boost products] to date to customers considering an AlterG unit." *Id.* ¶ 46.

## II. <u>LEGAL STANDARD</u>

For a plaintiff to survive a Rule 12(b)(6) motion to dismiss after *Ashcroft v. Iqbal*, 556

U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), his factual allegations "must . . . suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014). In other words, the complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'" *Id.*

The Ninth Circuit has outlined a two-step process for evaluating pleadings against this standard. "First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Levitt*, 765 F.3d at 1135 (citations omitted).

## III.     DISCUSSION

A.     Patent Infringement

AlterG alleges that Defendants directly, indirectly, and willfully infringed five of AlterG's patents. The '795 and '572 Patents (the "Weight Calibration Patents") relate to systems that adjust the air pressure inside the treadmill chamber in response to the body weight of the user. *See* Compl. ¶¶ 67–84. The complaint provides the following descriptions of the Weight Calibration Patents:

- [F]eatures of the technology claimed in the '795 Patent provide a system by applying pressure to a portion of a body of an individual in a chamber having an aperture along a vertical axis for receiving the portion of the body of the individual. A pressure sensor is coupled to the chamber for measuring a pressure inside the chamber. A negative feedback control system calibrates, adjusts, and maintains the pressure inside the chamber. Compl. ¶ 67.

4

- Broadly speaking, the '572 Patent claims a system by applying pressure to a portion of a body of an individual in a chamber having an aperture along a vertical axis for receiving the portion of the body of the individual. A pressure sensor is coupled to the chamber for measuring a pressure inside the chamber. A negative feedback control system calibrates, adjusts, and maintains the pressure inside the chamber. Compl. ¶ 73.

The '716, '764, and '656 Patents (the "Height Adjustment Patents") relate to adjustable mechanisms that allow a treadmill to accommodate users of different heights. Compl. ¶¶ 49–66. The complaint provides the following descriptions of the Height Adjustment Patents:

- Broadly speaking, the '716 Patent claims various embodiments of Differential Air Pressure systems and methods of using such systems. Without reference to the particular construction of any claim terms, features of the technology claimed in the '716 Patent include a Differential Air Pressure system that (1) may comprise a chamber configured to receive a portion of a user's lower body; (2) the Differential Air Pressure system may further comprise a user seal that seals the pressure chamber to the user's body; and (3) the height of the user seal may be adjusted to accommodate users with various body heights. Compl. ¶ 49.

- Broadly speaking, the '656 Patent claims various embodiments of Differential Air Pressure systems and components for Differential Air Pressure systems. Without reference to the particular construction of any claim terms, features of the technology claimed in the '656 Patent include (1) various methods and related structures for sealing a user into a pressurizable chamber; (2) various methods and related structures for changing the shape and/or height of the chamber; (3) various types and configurations of chambers and support structures for chambers; and (4) various methods and related systems for treating various conditions using the differential air pressure systems, including but not limited to obesity, cardiac disease, multiple sclerosis, cerebral palsy, or Down Syndrome. Compl. ¶ 55.

- Broadly speaking, the '764 Patent claims various embodiments of Differential Air Pressure systems and methods of using such systems. Without reference to the particular construction of any claim terms, features of the technology claimed in the '764 Patent include a Differential Air Pressure system that may comprise (1) a chamber configured to receive a portion of a user's lower body and to create an air pressure differential upon the user's body; (2) the Differential Air Pressure system may further comprise a user seal that seals the pressure chamber to the user's body; and (3) the height of the user seal may be adjusted to accommodate users with various body heights. Compl. ¶ 61.

### 1. Direct Infringement

The parties dispute the pleading standard that applies to claims of direct patent infringement. *See* Mot. at 6–7; Docket No. 19 ("Opp.") at 4. This dispute arises from a conflict

between the general pleading standard set forth in *Twombly* and *Iqbal* and the more lenient standard formerly applied to direct infringement claims pursuant to Form 18 to the Federal Rules of Civil Procedure. Form 18 was abrogated in December 2015. *See Novitaz, Inc. v. inMarket Media, LLC*, No. 16-CV-06795-EJD, 2017 WL 2311407, at *1 (N.D. Cal. May 26, 2017). Since then, "the majority of district courts"—including this court—"have assessed the sufficiency of claims for direct patent infringement under the standard set forth in *Twombly* and *Iqbal*." *Id.* at *2 (collecting cases); *see Software Research, Inc. v. Dynatrace LLC*, 316 F. Supp. 3d 1112, 1116 (N.D. Cal. 2018). The Court will continue to apply the same standard here.

A direct infringement claim "does not satisfy the standards of *Twombly* and *Iqbal* where it does not at least contain factual allegations that the accused product practices every element of at least one exemplary claim." *Novitaz*, 2017 WL 2311407, at *3. This requirement is animated by the principle that "the failure to meet a single limitation is sufficient to negate infringement of [a] claim." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

AlterG does not allege that Boost products practice every element of at least one exemplary claim. In particular, Defendants point out that the complaint contains no allegations that Boost products practice a key limitation of each of the two types of patents. The Weight Calibration Patents describe a mechanism that calibrates the pressure inside the treadmill chamber in response to the body weight of the user. *See* Compl., Exh. D ('795 Patent) (Claim 1 claiming a method of "generating a relationship between pressure and actual weight of the individual" and "regulating the pressure in the chamber with respect to the weight of the individual based on the relationship"); Exh. E ('572 Patent) (Claim 1 claiming an "exercise apparatus" that "is configured to receive an input of the individual's weight . . . , generate a measured weight and positive pressure relationship for the individual, and . . . to regulate the positive pressure in the chamber by referring to only the generated relationship."). The complaint does not allege that Defendants' products regulate chamber pressure by reference to a measured user weight. In fact, the complaint appears to say the opposite. *See* Compl. ¶ 44 ("[T]he Boost One [does] not calibrate to specific user's actual weight and volume dimensions like the AlterG DAP systems . . . .").

The Height Adjustment Patents describe adjustable mechanisms that accommodate

6

treadmill users of various heights. *See* Compl., Exh. A ('716 Patent) (Claim 1 claiming "a height adjustment assembly attached to the chamber adjacent to the seal interface"); Exh. B ('656 Patent) (Claim 1 claiming "a height adjustable structure having a plurality of height adjustment slots in a front of the chamber and a plurality of height adjustment slots in a rear of the chamber"); Exh. C ('764 Patent) (Claim 1 claiming "a movable assembly comprising . . . a height adjustment bar attached to the seal frame . . . configured to provide a vertical position adjustment of the height of the user seal by vertically moving the seal frame"). The complaint does not allege that the Boost One contains any height adjustment mechanism. AlterG's direct infringement claim is therefore inadequately pled. *See Atlas IP LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-05469-EDL, 2016 WL 1719545, at *4 (N.D. Cal. Mar. 9, 2016) (dismissing a direct infringement claim where "the complaint entirely fails to address [a] necessary element of claim 1").

      2.   <u>Indirect Infringement</u>

"[L]iability for indirect infringement of a patent requires direct infringement." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). Because AlterG's direct infringement claims have not been adequately pled, its indirect infringement claims fail as well.

      3.   <u>Willful Infringement</u>

AlterG alleges that Defendants' infringement of its patents is willful and therefore warrants enhanced damages under 35 U.S.C. § 284. However, this willful infringement claim must be dismissed because a finding of direct infringement is a prerequisite for willful infringement. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1930 (2016).

Defendants' motion to dismiss AlterG's patent infringement claims is **GRANTED** with leave for AlterG to amend its direct infringement claim.

**B.**   <u>Trade Secret Misappropriation</u>

AlterG's third cause of action is trade secret misappropriation. To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal.

2018) (citation omitted); *see* 18 U.S.C. § 1839(5) (defining "misappropriation" in the context of trade secrets).

                1.     <u>Alleging Trade Secrets with Sufficient Particularity</u>

Defendants argue that AlterG fails to identify its allegedly misappropriated trade secrets with sufficient particularity to state a claim under the DTSA. Mot. at 13–15. The Court agrees.

"A plaintiff need not spell out the details of the trade secret," but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."[1] *Alta Devices*, 343 F. Supp. 3d at 881 (citations, internal quotation marks and alterations omitted). *Alta Devices* provides helpful guidance as to the degree of particularity that is required. The court there found that the plaintiff, a manufacturer of thin-film solar technology, adequately pleaded its trade secret claim based on a combination of factors. First, the plaintiff identified "the exact technology in question: thin-film GaAs solar technology." *Id.* Second, the plaintiff listed with specificity the types of trade secrets relating to the "thin-film GaAs solar technology": "[m]ethods of[] high throughput thin-film deposition; epitaxial lift-off of the thin-film; and GaAs substrate maintenance and re-use," as well as "confidential cost analysis; proofs and tests of manufacturing concepts and techniques; tool roadmaps; manufacturing process flows; and identification of equipment and equipment vendors; and information related to the foregoing." *Id.* In addition to the fact that the technology was described with specificity, a non-disclosure agreement between the parties described with further particularity the confidential information that was imparted to defendants, for example, "CVD technology and its commercial viability," including the "CVD (Alta 2T) chamber scheme," "growth rate," "thin film quality," "uniformity," "gas utilization efficiency,"

---

[1] Plaintiff asserts that the "sufficient particularity" pleading standard applies only to claims under the California Uniform Trade Secrets Act ("CUTSA"), and not the DTSA. *See* Opp. at 9. Not so. The majority of courts in this district have held that the same standard is applied to both DTSA and CUTSA claims because "[t]he elements of misappropriation under the DTSA are similar to those under the CUTSA." *Alta Devices*, 343 F. Supp. 3d at 877; *see id.* at 880–81 ("Courts have held that the DTSA and the CUTSA share the same pleading requirements for the identification of trade secrets."). *But see Physician's Surrogacy, Inc. v. German*, No. 17CV0718-MMA (WVG), 2017 WL 3622329, at *9 (S.D. Cal. Aug. 23, 2017).

and "scalability and short cycle time feasibility." *Id.* Because the plaintiff's trade secret claims were based on the confidential information exchanged pursuant to the non-disclosure agreement, the court concluded that the defendant had fair notice of the scope of the trade secrets asserted. *Id.*

In contrast, the court in *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) found that the plaintiff failed to allege its trade secret claim with sufficient particularity. The plaintiff, a provider of business software, claimed that the defendant had misappropriated trade secrets including "source code, customer lists and customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, 'negative knowhow' learned through the course of research and development, and other information related to the development of its price-optimization software, including ideas and plans for product enhancements." *Id.* at *3. The court determined that the plaintiff had "set out its purported trade secrets in broad, categorical terms, more descriptive of the types of information that generally *may* qualify as protectable trade secrets than as any kind of listing of particular trade secrets [it] has a basis to believe actually were misappropriated here." *Id.* at *4 (emphasis in original).

Here, AlterG alleges that Defendants misappropriated the following trade secrets:

- "[N]umerous learnings from AlterG's Low-Cost Platform Project that explored market alternatives that included positive and negative learnings of low cost mechanical unweighted systems, air pressure systems, and Differential Air Pressure systems under strict confidentiality and non-disclosure agreements. Compl. ¶ 40.

- Trade secrets "related to AlterG's development of anti-gravity rehabilitation products" and "mechanical unweighting mainframes," including "technology and negative information and learnings." *Id.* ¶¶ 95–96.

- "[T]rade secret information related to AlterG's design and development of its anti-gravity rehabilitation and training units, including, but not limited to its marketing and product strategy, cost strategies, customer needs, material selection and fabrication techniques, engineering and structural technology, selection and qualification of components, knowledge of vendors with appropriate, specialized skills, and technology innovation." *Id.* ¶ 102.

These allegations more closely resemble the broad categories of information in *Vendavo* than the specific descriptions provided in *Alta Devices*. The references in paragraphs 40 and 95–

96 to "positive and negative learnings" and "technology and negative information and learnings" are vague. The types of information listed in paragraph 102 are somewhat more concrete, but are not tethered to a specific technology; it cannot be discerned which aspects of AlterG's "anti-gravity rehabilitation and training units" the information pertains to. And although AlterG, like the plaintiff in *Alta Devices*, has alleged that the trade secrets at issue are covered by confidentiality agreements between the parties, AlterG only summarizes rather broadly the categories of information protected by the agreements. *See* Compl. at 5 n.2 (defining "Confidential Information" to include "techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of the Company, and includes, without limitation, its respective information concerning research, experimental work, development, design details, and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales, and merchandising and marketing plans and information"). AlterG has not attached the agreements to the complaint, and its allegations fail to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade." *Alta Devices*, 343 F. Supp. 3d at 881.

Accordingly, Defendants' motion to dismiss AlterG's trade secret claim is **GRANTED**. AlterG is granted leave to amend its complaint to allege with greater specificity the types of trade secrets that were misappropriated and the exact technology to which they pertain. Such allegations may be enhanced if the confidentiality agreements between the parties detail the protected information that AlterG imparted to Defendants. In amending its trade secret claim, AlterG should also take care to delineate the boundaries between its trade secrets and its information that has been made public through patents and patent applications. *See Aqua-Lung Am., Inc. v. Am. Underwater Prod., Inc.*, 709 F. Supp. 2d 773, 788 (N.D. Cal. 2010) (explaining that "a plaintiff has a viable trade secret claim that would protect his proprietary unpatented technology[] only if he reveals implementation details and techniques *beyond* what was disclosed in his patent.") (emphasis in original) (citation omitted).

2.     Standing under DTSA

Defendants separately argue that AlterG's DTSA claim must be dismissed because AlterG only alleges acts of misappropriation that took place prior to May 11, 2016, the effective date of the DTSA. Mot. at 15. The DTSA applies to "any misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment of [the] Act." Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376, 381 (2016). The complaint alleges that "Defendants conspired almost immediately [after resigning from AlterG] to create a competing machine incorporating AlterG intellectual property." Compl. ¶ 39. Defendants seize upon the "almost immediately" language to suggest that the alleged acts of misappropriation must have started as early as April 2015, when Whalen and Allen resigned from AlterG, and before the DTSA was enacted. Mot. at 15.

AlterG counters that, although Defendants may have initially *disclosed* its trade secrets in 2015, they *used* the secret information in 2017, when they were developing the Boost One. Opp. at 9–10; *see* Compl. ¶ 38. This allegation is sufficient to support liability under the DTSA because "misappropriation" is defined as the "disclosure *or use* of a trade secret." 18 U.S.C. § 1839(5) (emphasis added). Relying on § 1839(5), courts have generally held that the continued use of a trade secret after the effective date of the DTSA is actionable, even if the secret was initially disclosed prior to May 11, 2016. *See, e.g.*, *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017); *AllCells, LLC v. Zhai*, No. 16-CV-07323-EMC, 2017 WL 2929380, at *1 (N.D. Cal. Mar. 27, 2017).[2]

The Court therefore finds that AlterG has standing to bring its trade secret claim.

C.     Breach of Contract

AlterG's second cause of action alleges that each Individual Defendant entered into

---

[2] It is true, as Defendants note, that the court in *Avago Techs. U.S. Inc. v. Nanoprecision Prod., Inc.*, No. 16-CV-03737-JCS, 2017 WL 412524 (N.D. Cal. Jan. 31, 2017) ruled the other way. However, *Avago Techs* pre-dates cases like *AllCells* and *Cave Consulting*, and its holding was informed in part by the plaintiff's inability to "cite[] any authority suggesting that the DTSA allows a misappropriation claim to be asserted based on the continued use of information that was disclosed prior to the effective date of the statute." *Id.* at *9. Since then, cases have consistently endorsed just that view.

confidentiality agreements with AlterG and breached those agreements "by integrating and using AlterG's proprietary and confidential information into the Boost treadmill products." Compl. ¶ 91. The elements of a breach of contract claim are: (1) the existence of a contract, (2) performance or excuse for nonperformance, (3) defendant's breach, and (4) damages. *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Defendants argue that AlterG fails to adequately plead three of these four elements.

### 1. Existence of a Contract

First, Defendants argue that the complaint does not describe with specificity the terms of the contracts that were allegedly breached. Mot. at 16. A plaintiff can state a claim for breach of contract by quoting verbatim the terms of the contract or attaching the contract to the complaint, but he is not required to do so. "[A] complaint for breach of contract must include the contract itself or plead its essential terms." *Gross v. Symantec Corp.*, No. C 12-00154 CRB, 2012 WL 3116158, at *11 (N.D. Cal. July 31, 2012).

Here, AlterG has not pleaded all of the essential terms of the relevant contracts. While the complaint states clearly that the contracts at issue require Individual Defendants to "keep confidential and not use or disclose AlterG's proprietary and confidential information in any way contrary to the benefit of AlterG," Compl. ¶¶ 20, 25–26, 34, it does not allege with sufficient particularity what the "proprietary and confidential information" is. The complaint merely lists broad categories of information covered by the agreements. *See id.* ¶ 34; *id.* at 5 n.2. As explained above, these broad categories are insufficient to put Defendants on notice of the scope of the trade secrets that are the subject of AlterG's DTSA claim. AlterG's breach of contract claim is also predicated on Defendants' alleged disclosure of trade secrets, and AlterG must allege with more specificity the types of information protected by its confidentiality agreements.

Two other arguments Defendants make are easily disposed of. The first is that AlterG references multiple confidentiality agreements but does not specify which particular ones were breached. Mot. at 16. But the complaint indicates that Defendants breached all of the agreements. *See* Compl. ¶ 91; Opp. at 11. The second argument is that the complaint does not explicitly state whether the confidentiality agreements continued to have effect after Defendants' employment

12

with AlterG terminated. Mot. at 17. The complaint alleges, however, that an agreement signed by Whalen provided that he would not disclose AlterG's confidential information during his work with AlterG "or at any time thereafter." Compl. ¶ 21. The allegations with respect to Allen's and Bean's agreements are not so explicit, but the complaint states that the agreements required Allen and Bean to "not disclose any of AlterG's confidential and proprietary information without AlterG's permission" without mentioning any time limitation. *Id.* ¶ 88. It is therefore reasonable to infer that the duty of confidentiality imposed by Defendants' agreements extended beyond their periods of employment.

### 2. Defendants' Breach

Next, Defendants argue that AlterG "failed to plead specifically how each individual has breached his respective contract(s)" because AlterG nowhere mentions "what specific confidential information or trade secrets were in fact integrated into the Boost One." Mot. at 17–18. The complaint currently alleges that the Boost One utilized "an anti-gravity unit that derived directly from the technology Whalen and other AlterG engineers developed for AlterG in the Low Cost Platform Project"; that Bean, while still employed at AlterG, "disclosed confidential and proprietary information about AlterG technology, marketing strategy, and prospective and actual customers and test sites to his friends at Boost"; and that "Defendants have taken technology and negative information and learnings from the [Low Cost Platform] Project . . . and applied them to the Boost One product." *Id.* ¶¶ 33, 36, 95. Once AlterG amends the complaint to describe the terms of its confidentiality agreements and the substance of its trade secrets with more particularity, it will be able to allege the specific trade secrets incorporated into the Boost One in violation of the confidentiality agreements.

### 3. Damages

Finally, Defendants claim that AlterG has failed to explain how the alleged breaches caused it to suffer damages, given that AlterG admits the LCPP was "not commercialized." Compl. ¶ 43. Defendants misapprehend AlterG's damages theory. The complaint states that Defendants used AlterG's confidential information to "unfairly compete with AlterG and sell over 20 units to date to customers considering an AlterG unit," causing "monetary damages" to AlterG.

Compl. ¶ 46. It is well-established that non-speculative lost sales or profits can constitute contractual damages. *See Illumina, Inc. v. Ariosa Diagnostics, Inc.*, No. C 14-01921 SI, 2014 WL 3897076, at *4 (N.D. Cal. Aug. 7, 2014); *Grupe v. Glick*, 26 Cal. 2d 680, 692 (1945). AlterG may not have brought LCPP-derived products to market, but it has nevertheless alleged that it has lost potential sales of its treadmills as a result of Defendants' exploitation of its confidential information from the LCPP. Allegations of "lost sales or profits" caused by a competitor's contractual breach are sufficient to establish damages at the pleadings stage. *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No. 16-CV-00253-WHO, 2016 WL 6393503, at *9 (N.D. Cal. Oct. 28, 2016).

Defendants' motion to dismiss AlterG's breach of contract claim is **GRANTED**. AlterG is granted leave to amend its complaint to either attach the relevant confidentiality agreements or to allege their essential terms.

D. Breach of Fiduciary Duty

AlterG's fourth cause of action alleges that Whalen breached the fiduciary duty he owed to AlterG by using AlterG's proprietary and confidential information to benefit Boost. Compl. ¶¶ 115–19. To state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991). Here, Defendants do not dispute that Whalen owed a fiduciary duty to AlterG while he was serving as its director, but contends that the duty ended when he joined Boost, because by that point he was no longer a director of AlterG. Mot. at 18–19.

Defendants are correct that, as a general matter, an officer's fiduciary duty to their employer ends upon their resignation. *See GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 421 (2000), *disapproved of on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140, 95 P.3d 513 (2004). However, "[c]ourts addressing the issue have rejected an expansive reading of the decision in *GAB Bus. Servs.* and appropriately recognized that officers are also charged with a continuing duty to protect privileged and confidential information, which continues even after they leave the company." *Sonoma Pharm., Inc. v. Collidion Inc.*, No.

14

17-CV-01459-EDL, 2018 WL 3398940, at *7 (N.D. Cal. June 1, 2018) (citation and internal quotation marks omitted).  Indeed, the Restatement of Agency makes clear that, post termination, an agent continues to have "a duty to the principal not to use or to disclose to third persons . . . trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use."  Restatement (Second) of Agency § 396(b).  This means that Whalen owed a continuing fiduciary duty to AlterG not to use its confidential information to its detriment, even after he joined Boost.  *See Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, No. C 10-02605 JW, 2011 WL 13153247, at *8 (N.D. Cal. Mar. 17, 2011) (finding breach of fiduciary claim adequately pled where plaintiff alleged that defendant "used his access to Plaintiff's proprietary customer information to further his own anti-competitive agenda during his subsequent employment with [a competitor]").

However, the breach of fiduciary duty claim arises from the same confidentiality agreements underlying AlterG's breach of contract claim.  As explained above, AlterG needs to describe the terms of the confidentiality agreements and the trade secrets they protect with more particularity so that it can be ascertained whether Whalen's disclosures constituted a breach of his fiduciary duty.  Accordingly, Defendants' motion to dismiss AlterG's breach of fiduciary duty claim is **GRANTED**, and AlterG may amend its complaint to either attach the relevant confidentiality agreements or to allege their essential terms.

E.  Interference with Contract

AlterG's fifth cause of action is interference with contract.  Compl. ¶¶ 121–27.  "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  Here, the complaint alleges that Defendants interfered with three sets of contracts: the confidentiality agreements between AlterG and Woodway; contracts between AlterG and its vendors, suppliers, and customers; and the confidentiality agreements between each

Individual Defendant and AlterG. Compl. ¶¶ 121–124. Defendants argue that AlterG's allegations are deficient as to all three.

### 1. Confidentiality Agreements between AlterG and Woodway

Defendants claim that the complaint fails to specify what agreements between AlterG and Woodway were interfered with. Mot. at 20. Defendants also argue that the complaint "presents no facts that support a possible breach of such agreements." *Id*.

The first argument in unpersuasive. The complaint specifies that the contracts at issue are two confidentiality agreements between AlterG and Woodway: "a Master Agreement signed May 30, 2007, and a subsequent agreement signed in 2012." Compl. ¶ 32. The essential terms of the agreements are also specified: "AlterG would provide to Woodway proprietary and confidential information to assist Woodway to build and supply AlterG with anti-gravity units," including "all specifications, drawings, files, instructions, and other documents," and this information was "not to be shared or used with or on behalf of any other person or entity." *Id*. ¶¶ 30–31.

However, Defendants' second argument has merit. The complaint states that "Whalen and Allen started secretly working with Woodway on developing a low-cost anti-gravity unit," and "utilized confidential, proprietary, and trade secret information from the [LCPP], and other AlterG intellectual property, to shortcut the research and development time to come to market with a lower cost unweighting treadmill utilizing a Woodway treadmill." Compl. ¶ 33. This does not mean, however, that Whalen and Allen induced or caused Woodway to disclose AlterG's confidential information to them. In fact, the complaint does not even allege that Woodway in fact disclosed any information; it merely states that Whalen and Allen "utilized" information. It is difficult to imagine that Woodway possessed any confidential information from the LCPP that Whalen and Allen did not already have, given that "Whalen was the principal consultant and engineer" on the LCPP and Allen was also heavily involved in the LCPP. *Id*. ¶¶ 22, 27. If anything, as AlterG's "principal liaison" to Woodway, Allen may have been the one who conveyed AlterG's information to Woodway in the first place. *Id*. ¶¶ 25, 28.

Thus, AlterG has failed to adequately allege that Defendants induced Woodway to breach its contracts with AlterG.

2.     Contracts with Vendors, Suppliers, and Customers

AlterG's allegations with respect to its vendors, suppliers, and customers are wholly

lacking.  The complaint states only that "[c]ontracts existed between AlterG . . . and AlterG

vendors, suppliers, and customers" and that "Defendants have . . . interfered with contracts

between AlterG and its vendors, suppliers, and customers."  Compl. ¶¶ 121, 124.  AlterG does not

identify any of these "vendors, suppliers, and customers," nor provide any details about the

contracts and contractual provisions with which Defendants allegedly interfered.  AlterG has

therefore failed to state a claim with respect to these contracts.  *See AccuImage Diagnostics Corp*

*v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (dismissing interference with

contract claim because plaintiff merely made "conclusory allegations that valid 'contracts' exist

between itself and an unspecified third party" and provided no "facts surrounding the type or

nature of the 'contracts' [defendants'] conduct allegedly interfered with").

3.     Confidentiality Agreements between Individual Defendants and AlterG

AlterG alleges that Defendants interfered with each other's confidentiality agreements with

AlterG.  Compl. ¶ 124.  Defendants counter that "[t]here is not a single statement, allegation, or

fact set forth in the complaint regarding Defendant inducing another Defendant to breach" these

agreements.  Reply at 11.  It is true that while the complaint alleges that the Individual Defendants

disclosed confidential information to each other, it stops short of explicitly stating that they

intentionally *induced* each other to disclose this information.  *See, e.g.*, Compl. ¶ 36 ("Bean . . .

disclosed confidential and proprietary information about AlterG technology, marketing strategy,

and prospective and actual customers and test sites to his friends at Boost" while he was still

working at AlterG.).  Nevertheless, a reasonable inference in AlterG's favor can be drawn that

Defendants encouraged each other's disclosure.  The allegation that they "conspired . . . to create a

competing machine incorporating AlterG's intellectual property" undercuts the possibility that

Whalen, Allen, and Bean each made the independent decision to disclose AlterG's information to

each other without any prompting.  Compl. ¶ 39.

However, because AlterG needs to allege with more specificity the essential terms of the

confidentiality agreements underlying this contractual interference claim, the Court will dismiss

17

this claim pending AlterG's amendment.

Accordingly, Defendants' motion to dismiss the interference with contract claim is **GRANTED with leave to amend**.

F.    <u>Interference with Prospective Economic Advantage</u>

AlterG's sixth cause of action alleges that Defendants interfered with its prospective economic advantage with Woodway and with AlterG's vendors, suppliers, and prospective and current customers. Compl. ¶¶ 129–33. The elements of a claim for intentional interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant." *Blank v. Kirwan*, 39 Cal. 3d 311, 330 (1985). "The chief practical distinction between interference with contract and interference with prospective economic advantage is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective." *Pac. Gas*, 50 Cal. 3d at 1126. Nevertheless, courts have made clear that "[t]he law precludes recovery for overly speculative expectancies by initially requiring proof" that it is "reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (1996) (emphasis in original) (citation and internal quotation marks omitted).

AlterG's vague allegations are insufficient to state a claim for interference of prospective economic advantage. With respect to Woodway, the complaint explains that Woodway supplies treadmills to AlterG and has long worked with AlterG to build treadmills "using AlterG's proprietary designs." Compl. ¶ 30. Thus, it can be reasonably inferred that this established commercial relationship contains the probability of future economic benefit to AlterG as Woodway continues to supply AlterG with treadmills. However, AlterG wholly fails to explain how Defendants' actions have jeopardized the ongoing supplier relationship between Woodway

and AlterG.[3]  The complaint does not allege that Defendants intentionally acted to disrupt Woodway's supply of treadmills to AlterG, or that the supply was actually disrupted.  Indeed, "[t]o this day, Woodway continues to supply treadmills to AlterG."  Compl. ¶ 30.

The allegations are even more lacking when it comes to AlterG's relationship with its "vendors, suppliers, and prospective and current customers."  Compl. ¶¶ 131.  Nowhere does the complaint identify these entities or allege any facts to explain their economic relationship with AlterG, much less suggest that such relationships contain[s] the probability of future economic benefit to [AlterG]."  *Blank*, 39 Cal. 3d at 330.  Without any facts, it is impossible for the Court to determine whether it is reasonably probable that the prospective economic advantage would have been realized but for Defendants' interference.  *See Buxton v. Eagle Test Sys., Inc.*, No. C-08-04404 RMW, 2010 WL 1240749, at *2 (N.D. Cal. Mar. 26, 2010) (dismissing interference claim because the complaint did "not contain factual allegations about the existence of any specific economic relationships with identifiable third parties").

Accordingly, Defendants' motion to dismiss Plaintiff's interference with prospective economic advantage claim is **GRANTED** with leave for AlterG to amend.

G.    Underline False Advertisement

AlterG's seventh cause of action alleges that Defendants engaged in false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  A false advertising claim under § 43(a) has five elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products."  *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105, 1110

---

[3] AlterG alleges Defendants induced Woodway to breach its confidentiality agreements with AlterG, but the complaint does not indicate that any such breach in confidentiality disrupted Woodway's supply of treadmills to AlterG.

(9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(1)(B)).

Because AlterG alleges that "Defendants' false and misleading statements were made in bad faith, willfully, knowingly, and intentionally," Compl. ¶ 136, its false advertising claim sounds in fraud and is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See TransFresh Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1017–18 (N.D. Cal. 2012). Accordingly, the complaint must allege "'the who, what, when, where, and how' of the fraud." *Id.* at 1017 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

AlterG's false advertising claim does not meet the Rule 9(b) pleading standard. The complaint adequately alleges "what" the content of the alleged false statements were and "how" they were false:

> (1) [T]he Boost One claims to adjust air pressure to allow specific body weight calibration at any body weight, between full weight and 20% of body weight, and can be adjusted in 1% increments of body weight. In fact, the Boost One, as tested, does not calibrate to a specific user, does not unweight in precise 1% of body weight increments, and cannot even distinguish an over 50 lb. weight difference between three different users that happen to use the same shorts and same rack height adjustment;

> (2) Boost claims the Boost One is safe and precise. But, not only does the Boost One not calibrate to specific user's actual weight and volume dimensions like the AlterG DAP systems, but the Boost One, as tested, did not record an error or stop when the air pressure dropped during a session when the shorts were unzipped. The Boost One air pressure also oscillates up and down during a session and does not remain stable – though no difference in calibration or pressure was noted on the machine;

> (3) Boost also implies that the Boost One is suitable for use in medical markets or is approved for hospital and clinic use so that it may be "prescribe[d]" for "patients" under the heading "Therapy & Rehabilitation" under product features at woodway.com. On information and belief, the Boost One has not been FDA approved like the AlterG DAP system, and Boost is actively deceiving consumers in their Boost One specification sheet; [and]

> (4) Boost also falsely implies that the Boost One has enjoyed wide market adoption by imputing the Woodway 4Front market to Defendants' Boost One. While the Woodway 4Front is a popular and widely distributed treadmill, on information and belief, the Boost One that incorporates a Woodway 4Front has not enjoyed

such widespread acceptance or use by "top athletes" and
"Hollywood stars."

Compl. ¶ 44 (line breaks added).

But the complaint does not specify "when" and "where" these statements were made. It merely asserts that "Defendants have disseminated" these statements. *Id.* This is not enough. *See TransFresh Corp. v. Ganzerla & Assoc., Inc.*, 862 F. Supp. 2d 1009, 1020 (N.D. Cal. 2012) (dismissing false advertising claim where plaintiff did not "allege specific facts as to when or where these statements were made").[4] Without information about where and when Defendants made the alleged false statements, the Court cannot determine whether the statements were "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion'" within the meaning of the Lanham Act. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734–75 (9th Cir. 1999) (quoting 15 U.S.C. § 1125(a)(1)(B)); *see, e.g.*, *Prager Univ. v. Google LLC*, No. 17-CV-06064-LHK, 2018 WL 1471939, at *10 (N.D. Cal. Mar. 26, 2018) (dismissing false advertising claim because the complaint lacked enough detail from which the court could determine whether the challenged representations were sufficiently disseminated).

The complaint similarly fails to identify the "who." "[W]ithin the realm of Rule 9(b), 'everyone did everything' allegations are not countenanced. *Prime Media Grp. LLC v. Acer Am. Corp.*, No. 5:12-CV-05020 EJD, 2013 WL 621529, at *3 (N.D. Cal. Feb. 19, 2013) (citing *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011)). But that is exactly what AlterG has alleged here. The complaint's allegations regarding false advertising are completely undifferentiated, merely asserting that "Defendants" are responsible for the statements. *See* Compl. ¶ 44. Although "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify *false statements* made by each and every defendant," and, "at a minimum, identif[y] the role of [each] defendant[]

---

[4] The only specific fact AlterG alleges in this regard is that Defendants' misrepresentation that the "Boost One" is suitable for use in medical markets or is approved for hospital and clinic use" is displayed at "woodway.com." Compl. ¶ 44. However, as Defendants point out, AlterG has alleged no facts to suggest that this statement made on *Woodway*'s website is attributable to *Defendants*.

in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (emphasis removed). AlterG has failed to do so.

Accordingly, Defendants' motion to dismiss AlterG's false advertisement claim is **GRANTED** with leave for AlterG to amend.

H.    Trade Libel

AlterG's eighth cause of action is trade libel, based on Defendants' "false, disparaging, and defamatory statements regarding AlterG's business and products to several AlterG customers and potential AlterG customers." Compl. ¶¶ 142–45. "Trade libel is defined as 'an intentional disparagement of the quality of property, which results in pecuniary damage.'" *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988) (quoting *Erlich v. Etner,* 224 Cal. App. 2d 69, 73 (1964)). A trade libel claim requires: (1) a publication, (2) which induces others not to deal with plaintiff, and (3) special damages." *Id.* (citing *Polygram Records, Inc. v. Superior Court,* 170 Cal. App. 3d 543, 548–49 (1985)). Moreover, "a plaintiff must allege: (1) who made the statements, (2) to whom the statements were made, (3) the time and place of publication, and (4) the substance of the statements." *NPK Indus. v. Hunter*, No. 15-CV-00811-SI, 2015 WL 5461667, at *4 (N.D. Cal. Sept. 16, 2015) (citations omitted).

Here, AlterG has adequately alleged who made the statements and the substance of the statements. The complaint specifies that "each of" the Individual Defendants told AlterG customers that "AlterG was going out of business, is in poor financial health and will not be able to get Woodway treadmills anymore," and that "AlterG DAP technology is inferior to that of Boost and that Boost is an equal or better system than AlterG DAP technology, but at a lower cost." Compl. ¶¶ 45, 142.

In contrast, AlterG has not adequately alleged when, where, and to whom the statements were made. It only asserts vaguely that the false statements were made to "several AlterG customers and potential AlterG customers," without identifying any of the customers. *Id.* ¶ 142. The trade libel claim is thus insufficiently pled. *Compare NPK Indus.*, 2015 WL 5461667, at *5 (finding a trade libel claim adequately pled where the complaint specified "that defendants . . . , through phone calls, visits and emails, made disparaging statements about [plaintiff] to

1    [plaintiff]'s customers and business partners, several of whom [plaintiff] identifies by name," and

2    that "these activities took place beginning in July 2013 and November 2013").

3         AlterG has also failed to plead the "special damages" element of its trade libel claim.  To

4    establish this element, a plaintiff "may not rely on a general decline in business arising from the

5    [alleged] falsehood, and must instead identify particular customers and transactions of which it

6    was deprived as a result of the libel."  *Mann v. Quality Old Time Serv., Inc.,* 120 Cal. App. 4th 90,

7    109 (2004), *disapproved of on other grounds by Baral v. Schnitt*, 1 Cal. 5th 376, 385 (2016).

8    Here, AlterG asserts that Defendants have "s[old] over 20 units to date to customers considering

9    an AlterG unit," causing "monetary damages" to AlterG.  Compl. ¶ 46.  However, AlterG has not

10   identified any particular customers associated with these sales, nor explained whether these

11   customers' decision to purchase Boost products in lieu of AlterG products was attributable to

12   Defendants' trade libel.  *See Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. C

13   14-0437 CW, 2016 WL 304764, at *11 (N.D. Cal. Jan. 26, 2016) (dismissing trade libel claims

14   because "[plaintiff] does not identify any customer who refused to do business with it as a result of

15   [defendant]'s allegedly libelous statements"); *Piping Rock Partners, Inc. v. David Lerner Assocs.,*

16   *Inc.*, 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013) (dismissing trade libel claim where "it is not even

17   clear if this allegation [of lost sales] is connected to counterdefendants' [libel]").

18        Accordingly, Defendants' motion to dismiss AlterG's trade libel claim is **GRANTED** with

19   leave for AlterG to amend.

20   I.    UCL Claim

21        AlterG's ninth cause of action is unfair competition, brought under California's Unfair

22   Competition Law ("UCL").  Compl. ¶¶ 147–53.  The UCL prohibits "any unlawful, unfair or

23   fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal.

24   Bus. & Prof. Code § 17200.

25        1.    "Unlawful" Prong

26        Under the "unlawful" prong, "[t]he UCL 'borrows violations of other laws and treats them

27   as unlawful practices that the unfair competition law makes independently actionable.'"  *Wilson v.*

28   *Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Cel-Tech Commc'ns, Inc. v.*

United States District Court
Northern District of California

*L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). Although AlterG's claims are not properly pled at this juncture, it may be able to cure its pleading deficiencies through amendment and establish violations of other laws that serve as a predicate for its "unlawful" claim. Accordingly, AlterG's claim under the "unlawful" prong of the UCL is **DISMISSED without prejudice**.

### 2. "Unfair" Prong

The "unfair" prong of the UCL prohibits a business practice that "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut.*, Inc., 142 Cal. App. 4th 1457, 1473 (2006). The California Supreme Court has held that "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186–87 (1999).

Here, AlterG describes Boost as "a direct competitor to AlterG." Compl. ¶ 117. However, nowhere in its complaint or briefing does AlterG allege or attempt to argue that the misconduct it describes with respect to Defendants threatens an incipient violation of an antitrust law or has effects comparable to a violation of an antitrust law. Indeed, case law suggests that the misconduct of a direct competitor must rise to significantly more serious levels than what has been alleged here to sustain a finding of unfairness under the UCL. *See, e.g.*, *In re Acacia Media Techs. Corp.*, No. C 05-01114 JW, 2005 WL 1683660, at *5 (N.D. Cal. July 19, 2005) (repeated filings of "objectively baseless patent infringement lawsuits" in "bad faith" are covered by antitrust law).

In response, AlterG argues that the false claims made by Defendants have also harmed consumers, Opp. at 18–19, and such harm supports its claim under the unfair prong. For this proposition, Defendants rely on *Luxul Technology Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156 (N.D. Cal. 2015), in which the court determined that the plaintiff had stated a claim under the unfair prong by alleging that the defendant "wrongfully and unfairly represented to third parties that [plaintiff]'s business and/or products are affected by legal issues that do not exist." *Id.* at

24

1174. But the parties in *Luxul Technology* were not direct competitors. Rather, the defendant was a sales representative for the plaintiff. *Id.* at 1165. That case is therefore inapposite.

### 3. "Fraudulent" Prong

To state a claim under the fraudulent prong of the UCL, "it is necessary only to show that members of the public are likely to be deceived" by the business practice or advertising at issue. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (citation and internal quotation marks omitted). Before evaluating the substance of AlterG's claim under this prong, however, the Court must ensure that AlterG has standing to bring the claim. The UCL limits standing to those individuals who had "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The California Supreme Court has interpreted this standing provision as "impos[ing] an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." *In re Tobacco II Cases*, 46 Cal. 4th at 326. Thus, "courts have recognized that UCL fraud plaintiffs must allege their *own* reliance—not the reliance of third parties—to have standing under the UCL." *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014) (emphasis in original); *see Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011) (holding that the "plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement").

AlterG's fraud claims here are predicated on the allegedly false statements Defendants made "to customers and prospects" about AlterG's financial situation and product quality. Compl. ¶¶ 45–46. While the complaint explains that AlterG was harmed by Defendants' fraud because *customers* relied on the misrepresentations and avoided AlterG's products, there is no allegation that AlterG itself relied on Defendants' statements. AlterG's opposition brief does not dispute this. Accordingly, AlterG does not have standing under the UCL to pursue a claim under the fraudulent prong. *See 23andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889, 911 (N.D. Cal. 2018) (dismissing claim under the fraudulent prong of the UCL where plaintiff alleged a competitor's misrepresentations deceived consumers).

4.  Restitution

Damages cannot be recovered through a UCL claim. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). A plaintiff who prevails on such a claim is limited to injunctive relief and restitution. *Id.* Defendants insist that AlterG is not entitled to UCL relief because "restitution under the UCL . . . is limited to money or property that defendants took directly from a plaintiff or in which a plaintiff has a vested interest.'" *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 867 (N.D. Cal. 2015) (citation and alterations omitted). Defendants' argument would carry the day if AlterG were seeking to recover money that Defendants made from sales to customers who would otherwise have purchased treadmills from AlterG. In that case, AlterG would not be asking for money that Defendants took directly from AlterG or in which AlterG has a vested interest. *L.A. Taxi Coop.*, 114 F. Supp. 3d at 867. But that is not AlterG's theory of relief. Rather, AlterG clarifies in its opposition brief that it is seeking to recover the value of the proprietary and confidential information Defendants misappropriated from AlterG. *See* Opp. at 19. That information is property in which AlterG "had an ownership interest." *Korea Supply*, 29 Cal. 4th at 1144–45. AlterG is thus entitled to restitution.

Accordingly, Defendants' motion to dismiss AlterG's UCL claim is **GRANTED** as to the unfair and fraudulent prongs. Dismissal of the unfair and fraudulent prong claims is **with prejudice** because AlterG has not demonstrated that Defendants' alleged conduct threatens an incipient violation of an antitrust law or that AlterG relied on Defendants' false statements.

J.  Conspiracy

AlterG's tenth cause of action alleges that Defendants entered into a conspiracy "to interfere with and damage AlterG's business and misappropriate AlterG's intellectual property and confidential information." Compl. ¶¶ 155–62. Defendants argues this claim must be dismissed because conspiracy cannot be pled as a standalone cause of action.

Defendants are correct that "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994). A conspiracy allegation must be

26

"activated by the commission of an actual tort." *Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 936 (N.D. Cal. 2015) (citing *Applied Equipment*, 7 Cal. 4th at 511). Here, AlterG may be able to state viable tort claims, such as for breach of fiduciary duty and interference with contract, via amendment. Accordingly, Defendants' motion to dismiss the conspiracy claim as an independent cause of action is **GRANTED**, but AlterG can amend its complaint to state the viable tort claim and to make clear that it is alleging that the Individual Defendants conspired to commit tortious acts and are therefore each liable for those acts under a theory of conspiracy liability.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss. The following causes of action are dismissed with prejudice:

- Ninth (UCL claim under the unfair and fraudulent prongs);
- Tenth (conspiracy as an independent cause of action).

The following causes of action are dismissed without prejudice, with leave to amend within 30 days of the date of this Order:

- First (patent infringement);
- Second (breach of contract);
- Third (trade secret misappropriation);
- Fourth (breach of fiduciary duty);
- Fifth (interference with contract);
- Sixth (interference with prospective economic advantage);
- Seventh (false advertisement);

///
///
///
///
///
///

- Eighth (trade libel);

- Ninth (UCL claim under the unlawful prong).

This order disposes of Docket No. 15.

**IT IS SO ORDERED**.

Dated: May 20, 2019

_____
EDWARD M. CHEN
United States District Judge